UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY TAULBEE,

       Plaintiff,

v.
                                     Civil Case No. 16-10807
                                     Honorable Linda V. Parker

UNIVERSITY PHYSICIAN GROUP,
operating under the assumed name of
WAYNE STATE UNIVERSITY PHYSICIAN
GROUP,

       Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This lawsuit asserting interference and retaliation claims under the Family Medical Leave Act ("FMLA"), disability discrimination, and a hostile work environment based on disability arises from Defendant's termination of Plaintiff's employment on September 23, 2014. The matter presently is before the Court on Defendant's motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 20.) The motion has been fully briefed. (ECF Nos. 23, 24.) Finding the facts and legal arguments sufficiently outlined in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

I.      **Factual and Procedural Background**

On May 1, 2010, Plaintiff began working at Defendant Wayne State University Physician Group ("UPG" or "Defendant") as a registered nurse in its Department of Consumer Relations triage call center ("Call Center").  In this position, Plaintiff took calls from patients, assessed symptoms, identified a clinical course of action, and followed through on the recommended course of action (e.g. scheduling appointments with the appropriate provider, refilling prescriptions, instructing patients to go to the emergency room or urgent care, etc…).  The Call Center handles calls for a system of 300 physicians and their patients.  Plaintiff was one of 15-25 people staffing the Call Center.

Call Center employees worked from 8:30 a.m. until 5:00 p.m.  (Def.'s Mot., Ex. 14 at 103.)  They regularly had to work beyond 5:00, however, to process prescriptions filled during the day and call back patients who left messages.  (*Id*. at 124-25.)  According to Plaintiff, employees complained about this mandatory overtime and tried to devise processes to complete the work before 5:00.  (*Id*. at 126.)

Call Center employees were required to report to work, log into the system, and be available to begin taking calls promptly at 8:30 a.m.  (Def.'s Mot., Ex. 3, ECF No. 20-5.)  During her deposition in this matter, Plaintiff acknowledged that an employee signing in a minute after 8:30 was considered late.  (*Id*., Ex. 14 at

2

104-05, ECF No. 21-1 at Pg ID 305.)  On November 1, 2012, Plaintiff's direct

supervisor, Rita Russell, sent Plaintiff an email memorializing their conversation

on October 26 regarding Plaintiff's repeated non-compliance with UPG's

attendance policy (i.e., not being logged onto the phone by 8:30 a.m.).  (*Id.*, Ex. 5,

ECF No. 20-7.)  Russell warned Plaintiff in the email that "[c]ontinued incidents of

non-compliance … will result in further disciplinary action up to and including

termination."  (*Id.*)

On November 5, 2012, Plaintiff sent an email to Miriam Bielski, UPG's vice

president of consumer relations, asking whether a discrepancy between the time on the

Plaintiff's computer and the system recording her log in time was causing her to

appear tardy.  (*Id.*)  Plaintiff noticed a discrepancy between the time on the

computer and the time on the manual phone that sat on her desk.  (*Id.*, Ex. 14 at 74,

80, ECF No. 21-1 at Pg ID 298, 299.)  Plaintiff claims that once she figured out

what the discrepancy was in late 2012, she stopped getting tardy notices.  (*Id.* at

80-81, ECF No. 21-1 at Pg ID 299.)  Nevertheless, on May 13, 2014, Plaintiff was

placed on a work plan ("Work Plan") requiring her to, among other things, "[b]e

on time and prepared to start and end [her] day at the scheduled time.  (*Id.*, Ex. 6,

ECF No. 20-8.)

Plaintiff logged in late every day the last two weeks of July 2014, and a total

of eleven times that month.  (*Id.*, Ex. 8, ECF No. 20-10.)  While Plaintiff worked

3

only eight days in August 2014, she signed in late four times.  (*Id*., Ex. 9, ECF No. 20-11.)  Bielski pointed this out to Amy Pezzotti, UPG's executive director of human resources, in an email on August 25, 2014.  (*Id*.)  Pezzotti responded that if Plaintiff is coming in late and not improving regarding the Work Plan, "we will move to termination."  (*Id*.)

Plaintiff's Work Plan also addressed what Defendant describes as her continuing unprofessional behavior.  According to a performance appraisal for the period July 22, 2011 to August 31, 2012, co-workers reported that Plaintiff exhibited a "negative attitude related to departmental policies, procedures, [and] processes."  (*Id*., Ex. 17 at 2, ECF No. 21-4 at Pg ID 364.)  In late March 2014, two of Plaintiff's co-workers, Ruth Proffer and Lisa Neumann, described Plaintiff's behavior as "disruptive," "negative", "distracting" and "disrespectful" in emails to their supervisors, Bielski or Mike Meyer, the latter who had replaced Russell.  (*Id*., Ex. 13.)  An April 4, 2014 email from Bielski to Pezzotti described Plaintiff's "ongoing verbal negativity on the floor" and negative comments she had made concerning Meyer.  (*Id*., Ex. 12 at 1, ECF No. 20-14 at Pg ID 269.)  Bielski related:

> It has come to my attention from various sources
> including patient complaints that [Plaintiff] is verbally
> negative on the floor and is upsetting team mates as well
> as staff outside the department who overhear her ongoing
> negative comments relating to the corporation, Mike and

4

his management, as well as her dislike for call center
protocol decisions.

(*Id*. at 2, ECF No. 20-14 at Pg ID 270.)

On July 1, 2014, Bielski emailed Pezzotti, reporting that she had to speak to

Plaintiff "regarding her inappropriate behavior and engagement of new

employees." (*Id*., Ex. 15, ECF No. 21-2 at Pg ID 355.)  According to Bielski,

Plaintiff was "bullying newcomers into saying how much they are getting paid",

commenting "on how many nurses have come and gone," and reporting that "she is

planning on going to Henry Ford[.]" (*Id*.)  Pezzotti requested an update from

Bielski in a July 23, 2014 email.  (*Id*., Ex 15, ECF No. 21-2 at Pg ID 352.)  Bielski

responded that Plaintiff was "continuing some of her negative activity." (*Id*., ECF

No. 21-2 at Pg ID 351.)  Bielski sent an email to Plaintiff the following day,

providing Plaintiff with examples of the negative activity that she "need[s] to

discontinue." (*Id*. at Pg ID 354.) In an August 25, 2014 email, Bielski informed

Pezzotti that Plaintiff continued to make negative comments and engage in

negative disruptive banter, which new employees Phillip Cramer and Tracy

Meloche reported to Plaintiff's then-supervisor Cheryl Grega.  (*Id*. Ex. 9, ECF No.

20-11.)

Bielski complained to Pezzotti again on September 19, 2014, indicating that

Plaintiff's "negativity and constant dissatisfaction is bringing down [Bielski's] new

staff." (*Id*., Ex. 10, ECF No. 20-12.)  Bielski requested that they move to dismiss

Plaintiff the following Monday or Tuesday.  (*Id*.) During her deposition, Plaintiff

acknowledged making negative comments to her co-workers about her work hours,

leave time, her pay compared to new hires, and criticizing Meyer.  (*Id*., Ex. 14 at

86-87, 90, ECF No. 21-1 at Pg ID 301-02.)

On September 22, 2014, Pezzotti emailed Nicole Mascia, UPG's senior vice

president and chief operating officer, seeking permission to terminate Plaintiff's

employment.  Pezzotti indicated that Bielski wanted to terminate Plaintiff who had

"been on a work plan since 5/13/14 and no improvement.  Feedback has been

consistent with the same problems."[1]  (*Id*., Ex. 10, ECF No. 20-12.)  Plaintiff was

terminated on September 23, 2014.

---

[1] Plaintiff asserted at her deposition and argues in response to Defendant's motion that she was removed from the Work Plan in June 2014.  (Pl.'s Resp. at 2, citing Def.'s Mot., Ex. 14 at 119-20.) It is unclear from Plaintiff's testimony, however, whether she was told the Work Plan had been terminated, merely assumed this to be the case, or is claiming this only now in litigation.  During her deposition, Plaintiff provided varying answers as to when she was removed from the Work Plan and whether she was expressly told that it was removed.  Plaintiff first testified that she concluded she was off the Work Plan because she and Bielski were no longer having regular meetings to assess Plaintiff's performance.  (*Id*. at 115.)  The evidence reflects, however, that Plaintiff and Bielski continued having these regular assessment meetings up to at least late July 2014.  The emails between Plaintiff's supervisors indicated that she remained on the Work Plan up to her termination.  (*See, e.g.,* Def.'s Mot., Ex. 15, ECF No. 21-2 at Pg ID , 351, 352, 355; Ex. 16, ECF No. 21-3.)  Further, Plaintiff provided on her EEOC charge that her discharge "was due to 'being on a work plan for negativity.' "  (*Id*., Ex. 21, ECF No. 21-8 at Pg ID 445.)  Nevertheless, whether Plaintiff was removed from the Work Plan and, if so, when that happened are not material facts relevant to the Court's disposition of Defendant's motion.

Prior to her termination, on July 3, 2014, Plaintiff had submitted a request for "CTO" from September 24-30, 2014.  (*Id*., Ex. 20, ECF No. 21-7.)  "CTO" stands for "combined time off" for vacation and sick leave, which employees accrued in a single bank.  (*Id*., Ex. 2A at 19, ECF No. 20-3 at Pg ID 141.) In the space on the leave request form asking for "Special Considerations for request" Plaintiff wrote: "out of town family wedding[.]"  (*Id*., Ex. 20, ECF No. 21-7.) However, Plaintiff testified at her deposition that there were multiple reasons for her requested time off: "a brother in rehab treatment, … a sister-in-law dying of cancer, … [her] grandma dying of old age[, a]nd [her] fibro flares in the fall from going from that summer to fall."  (*Id*., Ex. 14 at 142, ECF No. 21-1 at Pg ID 315.) Although acknowledging that the wedding was the only reason she put down on the leave request form, Plaintiff testified that her supervisors were aware of these other things.  (*Id*. at 142-44.)  Yet, Plaintiff admitted during her deposition that for this September leave, she never filled out an FMLA request form.  (*Id*. at 145.)  In fact, Plaintiff testified that she never requested FMLA leave or filed disability paperwork.  (*Id*.)

While the leave form reflects that Grega denied Plaintiff's request on August 25, 2014 (*id*., Ex. 20, ECF No. 21-7), Plaintiff claimed the decision had not been communicated to her and she had to go to management every Friday in the weeks

leading up to the requested time off to see if her request had been approved.  (*Id.*, Ex. 14 at 141-43, ECF No. 21-1 at Pg ID 314-15.)

At the end of the workday on Friday, September 19, 2014, Plaintiff sent an email to Bielski inquiring about the status of her "request for CTO."  (*Id.*, Ex. 18, ECF No. 21-5 at Pg ID 375.)  Plaintiff wrote: "I would like to know the status of this, today if possible, so that I can finalize plans for next week."  (*Id.*)  When Bielski had not responded and was absent the following Monday, Plaintiff sent an email to Grega in the morning, with the subject line "CTO request."  (*Id.*)  Plaintiff expressed that she hoped the matter would be finalized that day.  (*Id.*)  Grega sent an email to Pezzotti, asking what to tell Plaintiff regarding her CTO, as the decision had been made at that point to terminate her employment.[2]  (*Id.*; Ex. 16.)  Pezzotti responded the next morning, Tuesday September 23, seeking to arrange a time to deliver the news to Plaintiff that she instead was being fired.  (*Id.*, Ex. 18.)

Pezzotti planned to meet with Plaintiff and Grega at 4:00 p.m.  (*Id.*)  In the meantime, however, Plaintiff came to Grega's office asking to go home sick.  (*Id.*)  Grega conveyed this to Pezzotti in an email, adding:

> She states that the stress of not knowing what is going on
> with her leave request is making her "physically ill."  She

---

[2] There is no explanation in the record for why Defendant did not inform Plaintiff that her CTO request was denied when the decision was made in late August 2014, or at least when Plaintiff repeatedly asked about the status of her request in early September.  While the Court finds this curious, it does not bear on its analysis of Plaintiff's claims.

> says she has a fever and cough, etc.  She [is] "going to try
> to stick it out for the day." What do I do now? …

(*Id*.)  Plaintiff testified at her deposition that she also told Grega that "If you don't

give me my time I'm going to have to go on medical."  (*Id.*, Ex. 14 at 145, ECF

No. 21-1 at Pg ID 315.)  According to Plaintiff, Grega responded: "Don't let me

hear that."  (*Id*.)  Pezzotti came down shortly thereafter and informed Plaintiff of

her termination.

Plaintiff was diagnosed with fibromyalgia in 2010 or 2011.  (*Id*. at 21.)

According to Plaintiff, her illness never prevented her from working.  (*Id*. at 28,

38.)  In fact, Plaintiff testified that she has "hardly even missed a day's work."  (*Id*.

at 42.) While Plaintiff testified that she spoke with her doctors about taking a leave

from work if she needed it, they never told her "You should take time off … now."

(*Id*. at 24-25.)  According to Plaintiff, the only work accommodation her doctors

recommended was that she get up from her chair and move around occasionally:

"just to get up and walk or even just get up and stretch."  (*Id*. at 25.)  Plaintiff told

each of her direct supervisors at UPG about her doctors' recommendations and

they allowed her to do this.  (*Id*. at 28.)

While Plaintiff's supervisors did not object to her getting up to walk around

occasionally, she claims that they did not like her extended bathroom breaks.  (*Id*.

at 69-70.)  According to Plaintiff, Russell started following her to the bathroom

and Sue Janutol once yelled at her for going to the bathroom too often.  (*Id*. at 71-

72.)  Plaintiff complained to human resources about the incident with Janutol and

Bielski responded, indicating that they would discuss the matter with Janutol.  (*Id*.

at 72.)  In an email to Bielski, Janutol indicated that Plaintiff was not only going to

the bathroom during these breaks, but also making personal phone calls.  (Def.'s

Mot., Ex. 23.) Plaintiff in fact admitted that she was using the opportunity to return

phone calls.  (*Id*., Ex. 14 at 71.)  In any event, Plaintiff testified that Janutol never

yelled at her again.  (*Id*. at 73.)

According to Plaintiff, it was hard to get time off at UPG because of a

staffing shortage.  (*Id*. at 30.)  As far as Plaintiff could recall, however, there was

never an occasion where she was denied time off to see her physician.  (*Id*. at 30-

31.)  Plaintiff related that when she had surgery early in her employment, she had

no trouble getting leave for that, either.  (*Id*. at 25-26.)  According to Plaintiff, "[i]t

wasn't a problem" and Russell "even called [her] at home to check on [her]."  (*Id*.

at 36.)

The day after her termination, Plaintiff drove to the EEOC and filed a charge

of discrimination against UPG.  (*Id*. at 152.)  On the Charge of Discrimination

form Plaintiff submitted, she claimed that after being diagnosed with a disability

on November 20, 2012, she disclosed her disability to her supervisor and was

thereafter followed for observation on bathroom breaks and required to work past

her scheduled shifts.  (Def.'s Mot., Ex. 20, ECF No. 21-8 at Pg ID 445.)  Plaintiff

also claimed that she requested time off for medical treatment on or about August 11, 2014, but never received a response to her request and then was discharged on September 23, 2014.  (*Id*.)

Plaintiff filed this lawsuit against Defendant on March 7, 2016.  In her Complaint, Plaintiff asserts the following claims: (I) interference and retaliation in violation of the FMLA; (II) hostile work environment based on disability; and (III) disability discrimination in violation of the Americans with Disabilities Act ("ADA").

## II.   Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  Rule 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated."  Fed. R. Civ. P. 56(c)(4).  "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on

more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotations and brackets omitted).

Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").  The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## III.    Applicable Law and Analysis

### A.    FMLA

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided [by the Act]", 29 U.S.C. § 2615(a)(1), or "to discharge or in any other manner discriminate

13

against any individual for opposing any practice made unlawful by [the Act.]" *Id.* § 2615(a)(2). Plaintiff alleges that Defendant violated the FMLA both by interfering with her attempt to exercise her FMLA rights and by retaliating against her for that attempt. The Sixth Circuit recognizes these two discrete theories as "the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1)" and "the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (citations omitted). The proofs required for these theories differ.

### 1. Interference

To prevail on her interference or entitlement claim, Plaintiff must show that:

> (1) she was an eligible employee, (2) … [D]efendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave [her] employer notice of her intention to take leave, and (5) [her] employer denied the … FMLA benefits to which she was entitled.

*Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citations omitted). The employer's intent is not relevant to the inquiry. *Id.* However, the FMLA and the Department of Labor's implementing regulations "establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 508 (citing *Arban v. West Publ'g Co.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing

him from exercising his statutory rights to FMLA leave or reinstatement, but only

if the dismissal would have occurred regardless of the employee's request for or

taking of FMLA leave.")); 29 C.F.R. §§ 825.216(a), 2614(a)(3).

UPG argues that Plaintiff cannot prove the third and fourth prongs necessary

to establish her interference claim.  UPG also argues that it had a legitimate reason

unrelated to Plaintiff's exercise of her FMLA rights for terminating her

employment.

The FMLA grants eligible employees the right to leave for one or more of

the following reasons:

> (A) Because of the birth of a son or daughter of the
> employee and in order to care for such son or daughter.
>
> (B) Because of the placement of a son or daughter with
> the employee for adoption or foster care.
>
> (C) In order to care for the spouse, or a son, daughter, or
> parent, of the employee, if such spouse, son, daughter, or
> parent has a serious health condition.
>
> (D) Because of a serious health condition that makes the
> employee unable to perform the functions of the position
> of such employee.
>
> (E) Because of any qualifying exigency (as the Secretary
> shall, by regulation, determine) arising out of the fact that
> the spouse, or a son, daughter, or parent of the employee
> is on covered active duty (or has been notified of an
> impending call or order to covered active duty) in the
> Armed Forces.

29 U.S.C. § 2612(a)(1).  In response to Defendant's motion, Plaintiff contends that when she requested FMLA leave, she "had a brother in rehab treatment[,]" "[a] sister-in-law dying of cancer[,]" and a "grandma dying of old age."  (Pl.'s Resp. Br. at 6-7.)  None of these are FMLA-qualifying reasons, however.[3]  Thus, the only question is whether Plaintiff suffered from a "serious health condition" that made her "unable to perform the functions of [her] position …."

Assuming that Plaintiff's fibromyalgia constituted a serious health condition, she nevertheless presents no evidence suggesting that it rendered her "unable to perform the functions of [her] position."  In its implementing regulations, the Department of Labor provides the following definition of this phrase:

> An employee is unable to perform the functions of the position where the [employee's] health care provider finds that the employee is unable to work at all or is unable to perform any of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act, … and the regulations at 29 CFR 1630.2(n).  An employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment.

---

[3] Not only are none of these individual's Plaintiff's spouse, child, or parent, but Plaintiff does not establish that she requested leave "to care for [them]."  *See* 29 U.S.C. § 2612(a)(1)(C).

29 C.F.R. § 825.123(a).  The evidence does not suggest that Plaintiff's doctors ever told her she could not work *at all* or that she was unable to perform any of the essential functions of her job.

It appears from Dr. Weathek Sakka's progress notes—they are practically illegible—that he advised Plaintiff to take "some time off" or a "few days off" work at office visits on June 20 and August 20, 2014.  (Def.'s Mot., Ex. 22, ECF No. 21-9 at Pg ID 457, 459.)  Plaintiff testified, however, that her doctors never told her that she needed to stop working.  (*Id.*, Ex. 14 at 24-25.)  Plaintiff also testified that there had never been a time when her symptoms were so bad that she could not go to work.  (*Id.* at 38.)  In fact, she testified that she has hardly missed a day's work.  (*Id.* at 42.)  The only accommodation Plaintiff's doctors recommended was that she get up from her chair, walk around, and stretch occasionally.  (*Id.* at 25, 28.)  There is no indication that this interfered with Plaintiff's ability to perform her job and Plaintiff acknowledged that her supervisors allowed for this accommodation.  Thus, Plaintiff fails to show that she was entitled to FMLA leave.

Nevertheless, even if Plaintiff satisfied this element of her interference claim, she fails to show that she informed UPG of her intent to take FMLA leave.  According to Plaintiff, the only occasion UPG denied her request for leave was her CTO request for the week of September 24, 2014, which she wrote was needed for

an out-of-town family wedding.  While Plaintiff claims she told Grega just weeks

prior to her termination that she needed the time off to visit her brother who was in

rehab treatment (*see* Pl.'s Resp. Br. at 7, citing Def.'s Mot., Ex. 14 at 143), as

discussed earlier, this did not qualify her for FMLA leave.  While Plaintiff

complained of feeling sick on the day of her termination, there is no evidence that

this was related to her fibromyalgia or any other serious medical condition.

Instead, Plaintiff apparently told Grega that the stress of not knowing what was

going on with her leave request was what was making her "physically ill."  (Def.'s

Mot., Ex. 18, ECF No. 21-5 at Pg ID 374.)  Further, Plaintiff told Grega that she

was going to "stick it out for the day."  (*Id*.)

Under the circumstances, Plaintiff did not provide notice to UPG of her need

for FMLA leave when she told Grega: "*If* you don't give me my time I'm going to

have to go on medical."  (*Id*., Ex. 14 at 145, emphasis added.)  As discussed, the

only reason Plaintiff provided on the CTO request form for the leave was an out-

of-town family wedding.  As Plaintiff testified to explain why she did not list other

reasons for her CTO request: "Well, I didn't write all the reasons, you know, I just

wanted a week off.  I had 130 hours.  I want a week off … like I just want 40 hours

off."  (*Id*. at 143.)

Plaintiff is correct that "an employee does not have to expressly assert [her]

right to take leave as a right under the FMLA."  *Cavin v. Honda of Am. Mfg., Inc.*,

18

346 F.3d 713, 723 (6th Cir. 2003) (internal quotation marks and citation omitted).

Nevertheless, the employee must give the employer " 'enough information for the

employer to reasonably conclude that an event described in the FMLA

§ 2612(a)(1) has occurred.' "  *Id.* at 724 (brackets omitted) (quoting *Hammon v.*

*DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999)).  While the Sixth Circuit

recently described this as a "low threshold requirement," *Reeder v. Cty. of Wayne*,

No. 16-2257, 2017 WL 2463299, at *4 (6th Cir. June 7, 2017) (unpublished),

nothing Plaintiff conveyed to her supervisors at UPG suggested that she was

requesting leave beginning September 24, 2014 because of an event described in

§ 2612(a)(1).

    For these reasons, the Court is granting Defendant summary judgment on

Plaintiff's FMLA interference claim.

### 2.    Retaliation

    To prevail on her FMLA retaliation claim, Plaintiff "must show that: (1)

[s]he was engaged in a statutorily protected activity; (2) [UPG] knew that [s]he

was exercising h[er] FMLA rights; (3) [s]he suffered an adverse employment

action; and (4) a causal connection existed between the protected FMLA activity

and the adverse employment action."  *Seeger*, 691 F.3d at 283 (citation omitted).

As discussed above, Plaintiff fails to show that she was engaged in statutorily

protected activity or that her supervisors knew she was exercising her FMLA

rights.  Therefore, the Court is granting summary judgment to Defendant on Plaintiff's FMLA retaliation claim, as well.

**B.**     **Hostile Work Environment**

While Plaintiff does not identify the statute under which she asserts her hostile work environment claim, the Court presumes that the claim is asserted under the Americans with Disabilities Act ("ADA").  To maintain such an action, the plaintiff "must demonstrate that: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures."  *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (unpublished); *see also Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (holding that the elements of a hostile work environment claim are the same across discrimination contexts and applying those elements specifically to the Age Discrimination in Employment Act).  Defendant seeks summary judgment with respect to this claim, arguing that Plaintiff was neither disabled nor subjected to harassment, much less harassment based on a disability.

A person is considered "disabled" under the ADA if he or she "had an impairment that substantially limited her major life activities, … a record of such an impairment, or … was perceived as having such an impairment."  *Kocsis v.*

20

*Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996); *see also*, 42 U.S.C.

§ 12102(12).  There is no evidence that Plaintiff was substantially limited in any

major life activity.  Perhaps, as Plaintiff asserts, fibromyalgia "*can be* disabling[.]"

*Lucas v. Comm'r of Soc. Sec.*, No. 13-00483, 2014 WL 4065608, at *6 (S.D. Ohio

Aug. 14, 2014) (unpublished) (emphasis added).  However, there is no evidence

that it was in Plaintiff's case.  While Plaintiff asserts in response to Defendant's

motion that "[n]ot being able to walk is a disability" (Pl.'s Resp. Br. at 23), there is

no evidence that Plaintiff is incapable of walking.[4]  But even if Plaintiff is disabled,

she fails to show that she was subjected to harassment, much less harassment based

on her disability.

The Supreme Court has explained that for a plaintiff to have suffered from a

hostile work environment, his or her workplace must have been "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

(internal quotation marks and citation omitted). When deciding whether the

plaintiff was subjected to a hostile work environment, the court must consider all

the circumstances, "including the frequency of the discriminatory conduct; its

---

[4] The fact that the only accommodation Plaintiff's physicians recommended was
that she get up from her chair and walk around occasionally demonstrates the lack
of merit of her assertion of this disability.

21

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted).

Plaintiff's claim of harassment is based on the monitoring of her bathroom breaks. (*See* Compl. ¶¶ 42-52.) During her deposition, Plaintiff described two incidents related to those breaks: Russell following her to the bathroom and Janutol yelling at her for using the bathroom too often. A reasonable juror could not find Plaintiff's workplace permeated with intimidation, ridicule, or insult based on these incidents, alone. Moreover, neither incident is related to Plaintiff's disability. There is no evidence suggesting that Plaintiff's fibromyalgia required her to use the bathroom frequently or that she ever told anyone at UPG that it did.

Plaintiff argues that she satisfies her burden of establishing a hostile and abusive work environment through the affidavit of her former co-worker Lucretia High.[5] High states in her affidavit that management "harassed" Plaintiff. (Pl.'s

---

[5] In response to Defendant's summary judgment motion, Plaintiff offers affidavits from other former co-workers. (*See* Pl.'s Resp., Exs. 1, 3-5.) Putting aside the questionable admissibility of much of what is asserted in these affidavits, none of them except Jeffrey Suhre's describes incidents of alleged harassment of Plaintiff. In his affidavit, Suhre describes Plaintiff "being closely monitored at work and when she would go to the bathroom on several occasions" (*id.*, Ex. 4 ¶ 2); however, this conduct does not support Plaintiff's hostile work environment claim because there is no evidence that it was based on her disability. There is no

Resp., Ex. 2 at ¶ 2.)  Yet High fails to describe what that "harass[ment]" entailed

so as to enable the Court to make the legal assessment of whether it was sufficient

to create a hostile work environment and whether it was based on Plaintiff's

alleged disability.

High also states in her affidavit that she found the work environment at UPG

hostile.  (*Id.*)  She writes:

> Management at the Wayne State University Call Center
> did not treat their employees like human beings, and I
> could only work there for about 9 months until I had to
> quit because I could not continue to work in that
> environment as it was a hostile working environment.

(*Id.*)  Again, High does not provide details of the specific conduct creating a

"hostile work environment."  High's assessment that there was "a hostile work

environment" is an inadmissible legal conclusion. *See Papasan v. Allain*, 478 U.S.

265, 286 (1986); *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986).

Moreover, High's affidavit suggests that the harassment, even if rising to a

cognizable level, was extended to all Call Center employees, regardless of any

disability.

For these reasons, the Court is granting summary judgment to Defendant on

Plaintiff's hostile work environment claim.

---

evidence suggesting that Plaintiff's fibromyalgia required her to use the bathroom
frequently or that she ever told anyone at UPG that it did.

## C.     Disability Discrimination

Plaintiff alleges that she was terminated from UPG because of her disability in violation of the ADA.  Absent direct evidence of disability discrimination, which is the case here, the plaintiff bears the burden of first establishing a prima facie case by showing that: (1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) the plaintiff's position remained open while the employer sought other applicants or the plaintiff was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).  In addition to its argument that Plaintiff was not disabled, Defendant contends that Plaintiff cannot establish a prima facie case of disability discrimination because it was not aware and had reason to know of her disability.[6]

As discussed above, Plaintiff fails to create a genuine issue of material fact with respect to whether she was disabled, as defined under the ADA.  Additionally, while Plaintiff testified that she told her supervisors she suffered from fibromyalgia, there is no evidence suggesting that those supervisors were aware or had reason to believe that this condition was disabling.  In short, Plaintiff fails to

---

[6] Defendant also argues—as it did with respect to Plaintiff's other claims—that it had a legitimate, nondiscriminatory reason for terminating Plaintiff.  The Court again finds it unnecessary to address this argument.

establish a prima facie case of disability discrimination.  Defendant is entitled to summary judgment with respect to this claim, as well.

## IV.    Conclusion

For the reasons set forth above, the Court concludes that Plaintiff's FMLA claims fail because the record evidence does not show that she was entitled to FMLA leave or that she gave Defendant notice of her intent to take FMLA leave. Plaintiff's hostile work environment based on disability and disability discrimination claims fail because the evidence does not show that Plaintiff was "disabled" as defined under the ADA.  Moreover, Plaintiff does not offer evidence of conduct sufficiently severe or pervasive to create a hostile work environment, much less conduct based on her disability.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 26, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 26, 2017, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager

25